Filed 7/31/14  In re David G. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DAVID G., et al., Persons Coming Under the Juvenile Court Law. | B253619 |
| | (Los Angeles County Super. Ct. No. CK80412) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| JULIA G., et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County.  Julie Fox Blackshaw, Judge.  Affirmed as to mother; dismissed as to father.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant Julia G.

Frank H. Free, under appointment by the Court of Appeal, for Defendant and Appellant David G.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel for Plaintiff and Respondent.

Parents Julia G. (mother) and David G. (father) appeal from the termination of their parental rights to their two children, David G., Jr. (David) and Daniel G. (Daniel). Mother contends that the juvenile court abused its discretion in denying her petition to modify prior orders terminating reunification services,[1] and that the court erred in refusing to apply the "benefit exception" to the termination of parental rights.[2]  Father's appointed counsel filed a brief that raised no issues, but asked that if mother's challenges were well taken, the termination order be reversed as to him as well.[3]  Father was given the opportunity to submit an additional letter or brief identifying any contentions he wished to raise on appeal, which he has not done.  Accordingly, his appeal will be dismissed as abandoned pursuant to *In re Phoenix H*. (2009) 47 Cal.4th 835, and *In re Sade C*. (1996) 13 Cal.4th 952.  We reject mother's contentions and affirm the termination order.

## BACKGROUND

In December 2009, the Los Angeles County Department of Children and Family Services (Department or DCFS) detained David at birth and filed a petition to bring him within the jurisdiction of the court.  On April 6, 2010, the juvenile court sustained the first amended dependency petition, adjudicated David a dependent of the juvenile court, and placed him in the care and custody of his maternal aunt Jessica R. (Jessica).  The sustained petition alleged that when David was born, both he and mother tested positive for the existence of methamphetamine, amphetamine and opiates, and that mother had a history of illicit drug use, including the abuse of the prescription drug Adderall.  The sustained petition also alleged that father was a registered substance abuse offender, with a long history of drug abuse and numerous arrests and convictions for possession of

---

[1]      See Welfare and Institutions Code section 388, subdivision (a).  All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2]      See section 366.26, subdivision (c)(1)(B)(i).

[3]      See generally, *In re A.L.* (2010) 190 Cal.App.4th 75, 80.

narcotics, possession of narcotics for sale, second degree burglary, second degree robbery, and battery.

The Department reported that mother too had a lengthy criminal history, including gun and drug related arrests and convictions beginning in 2000. In addition, father had failed to reunify with David's half-sisters several years earlier. Father's parental rights to his daughter Melissa were terminated in 2005, and she was thereafter adopted. At the jurisdiction/disposition hearing on April 6, 2010, the court ordered monitored visits and reunification services for the parents, and ordered them to participate in individual counseling, parenting classes, drug counseling, and to undergo random alcohol and drug tests. The following month, father was ordered to attend AA or NA meetings.

Despite notice, neither mother nor father appeared at David's six-month review hearing in October 2010. The juvenile court found that reasonable services had been provided to mother and father and that they were not in compliance with the reunification plan. The court terminated parents' reunification services with regard to David, and scheduled a section 366.26 permanent plan hearing for February 2011. The section 366.26 hearing was later continued to March 2011.

In December 2010, when Daniel was two months old, he was also detained from mother and father's custody. The Department filed a dependency petition alleging both parents' histories of substance abuse, the provision of permanent placement services to Daniel's brother David, and father's criminal history. The court ordered monitored visits for both parents, but no reunification services were provided to father due to the prior termination of parental rights.[4] The court ordered mother to participate in individual counseling and to undergo random drug tests. The court ordered father to participate in drug counseling and to undergo random drug tests. Daniel was placed in the custody of his paternal aunt, Irene C. (Irene), who had adopted David's half-sister Melissa, several years before.

---

**4**     See section 361.5, subdivision (b)(10).

In February 2011, the Department reported that father had been arrested on theft and robbery charges and was incarcerated pending a court hearing. Mother was in compliance with her aftercare program, was receiving individual and drug counseling, and had tested negative in three random drug tests. In March 2011, the court sustained the dependency petition regarding Daniel and adjudicated him a dependent of the juvenile court. The court ordered a permanent plan of legal guardianship for David, naming Jessica as legal guardian. The court ordered monitored visitation for the parents a minimum of one hour once per week.

During the next few months, the juvenile court terminated its jurisdiction over David and attempted to transfer Daniel's matter to Riverside County, where mother was reportedly living. Since the Riverside court was unable to verify residence, the matter was returned to Los Angeles. From July to September 2011, the children's social worker (CSW) reported difficulties in communicating with mother to verify her residence, explaining that mother did not return many telephone calls and seemed "guarded" about giving information about her whereabouts. The CSW reported that mother was living in Riverside County, but she had no stable home and had refused to make herself available to Riverside County child welfare workers. Mother's visits to Daniel were sporadic, occurring approximately once a month, but mother was appropriate and attentive during the visits. In late August, the CSW learned that mother had an outstanding arrest warrant. During this time father was incarcerated and did not visit Daniel.

In October 2011, the CSW reported that mother had been arrested and father was still in custody with a release date of March 2013. Mother had discontinued visits to her therapist some months earlier and had not visited Daniel since August. Neither parent had been drug testing or had completed a drug rehabilitation program.

The juvenile court removed Daniel from the custody of both parents and ordered that he remain in Irene's custody at the January 2012 disposition hearing. The court ordered family reunification services and monitored visits for mother. Mother was ordered to participate in a parenting course, individual counseling, a full drug/alcohol program with aftercare, to investigate an in-patient drug program with the Riverside

4

Probation Department, to enroll in a 12-step program with a court card and a sponsor, and to submit to random drug and alcohol testing.

In July 2012, Jessica filed a section 388 petition seeking to adopt David after serving as his legal guardian for one year.[5]  The CSW reported that Daniel's caretaker Irene, had expressed an interest in adopting Daniel.  The CSW had lost touch with mother from January until March 2012, when he learned that mother was incarcerated in Riverside County for drug possession, with a release date of October 2012.  Mother was enrolled in GED and substance abuse classes offered in the jail, but had not enrolled in counseling services which were also offered.

Jessica's section 388 petition was granted in September 2012, and a new section 366.26 hearing as to David was scheduled for the following January.  With regard to Daniel, the juvenile court found mother in partial compliance with the reunification plan, and ordered reunification services to continue, with monitored visits twice per week once mother was released from jail.  In January 2013, Daniel's section 366.22 permanency review hearing was calendared for March 2013, and David's section 366.26 hearing was continued to the same date.  In the meantime, the CSW reported no contact with mother from the time of her release from custody until mid-December, at which time the CSW referred mother to the Clare Foundation and to a DCFS representative to assist her in obtaining Medi-Cal services.

In March 2013, the juvenile court found that mother was not in compliance with the case plan for Daniel, terminated reunification services, and scheduled a section 366.26 hearing regarding Daniel.  The court continued David's hearing to July, and later to September 2013.  Hearings for both minors ultimately went forward on October 28, 2013.  Prior to the hearing, mother and father filed separate section 388 petitions.  Father alleged that he had completed a 16-week recovery program while incarcerated, had

---

[5]    "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."  (§ 388, subd. (a).)

visited David approximately two or three times per week since he was released in February 2013, and had participated in individual counseling. Mother alleged that in September 2013, she completed a 26-week course in parenting and substance abuse classes, with individual counseling. Hearing on the petitions went forward on October 28, 2013, the date scheduled for the section 366.26 hearings.

Prior to the hearing, the Department reported that the parents had been visiting David and Daniel twice per month and that the quality of visits was appropriate. David was healthy and thriving in Jessica's home, but due to some defiant and angry behavior, David was in therapy. He was responding well to therapy and had began attending a therapeutic preschool program in August 2013. Daniel was physically and emotionally healthy, developing appropriately, and had formed a close bond with Irene, his only caretaker since he was two months old. Home studies were completed and approved for both homes. At the hearing, father testified that he had been incarcerated for 25 months, beginning in January 2010. During that time, he participated in parenting and anger management courses and two substance abuse programs in jail, although he was not able to complete a second substance abuse program due to his release from custody. He attached certificates of completion or progress letters, except for those that were not sent to him. Two weeks after his release, he began substance abuse counseling, as well as individual and group therapy in which he participated for six months. He had been sober since three months prior to incarceration, with the exception of "maybe . . . two beers" in the past six months. He was due to complete probation the following month. Father claimed he attended N.A. meetings in Riverside, but he needed a new sponsor; he had only a temporary sponsor in Santa Monica. When asked what step he was working on, father testified that he skipped step 4, making amends, and did not know what step 3 was. He explained that he had not really been working on the steps as he should have and had really not participated in a 12-step program. The three-month programs in prison, Behavioral Development and Celebrate Recovery, did not use the 12 steps. Father denied that mother lived with him, although they were still in a relationship and mother's

address and his were the same. Father claimed that he stayed with his nephew at least three nights per week.

Father said he had regularly visited his sons at least twice a week for the past six months and had never had unmonitored visits nor had his visits ever been liberalized. Although David never lived with father, and Daniel lived with him for just two or three months, father thought it would be detrimental to them to be taken away from father. He testified that during visits David approached father and mother when he saw them, had a pretty good time with them, and cried half or three-quarters of the time when visits ended. Father testified that during visits Daniel called him "Daddy," asked for his mom, played, and cried about half the time when they left.

Father was currently living in Moreno Valley with his mother and daughter, and there was room for the boys there. Father was not employed at the time of the hearing and had not investigated childcare for the boys. Since father's mother had Parkinson's disease and his adult daughter worked, neither of them would be able to help. Father thought that David was enrolled in Head Start and was in therapy for behavior issues, but did not think that either of his sons had a medical issue. Father had not visited the Head Start school, did not know the name of the teacher, David's therapist, or either boy's doctor. He testified that he would seek to enroll David in the best Head Start program he could find in his area.

Mother testified that she was incarcerated for three months in 2012 for possession of a controlled substance. She was released into a program with an ankle monitor, but violated a term of her release in March 2012 and was again incarcerated until October 16, 2012. Mother then completed programs in parenting, drug counseling, and individual counseling in July or August 2013.[6] It took such a long time because she "had a really bad drug problem." After she completed the drug treatment program with Another Chance, mother did not enroll in another program. Mother claimed she attended N.A. meetings three or four times per week, spoke to her sponsor as often as she could, and

---

[6] A certificate of completion from Another Chance Health Services is attached to mother's petition.

worked on her 12 steps. Her sobriety date was October 16, 2012, and she was still on the first step, but she was unsure what that step entailed, either belief in a power greater than herself or admitting that she was powerless and that her life had become unmanageable. She was not in therapy.

While incarcerated mother did not visit with David because her sister would not bring him to the jail. However she testified that she telephoned both boys. Mother did not visit the minors often after her release, and did not see David until his birthday in December 2012. She did visit them on holidays, however. Mother visited with David two days before the hearing, and her last visit with Daniel was on his birthday, the preceding week. They went to the park where mother pushed him on the swing and played monsters with him and her niece. Mother's visits have always been and continue to be monitored by her sister, sister-in-law, or her mother's aunt. The boys call her Mommy Julia or Mommy.

Mother testified that she lived alone in an apartment which had room for the boys. Mother's father had paid her first month's rent. Although she still had a dating relationship with father, he did not come to her apartment and she did not go to his house. Instead, she saw him on their visits with the boys about two or three times per week and sometimes they would go to the movies on the weekends.

Mother was not employed, but seeking employment. She had not looked into daycare. Mother thought David needed therapy because of his behavior and that Daniel needed therapy because he was more active than David. Though mother also thought her sister-in-law was a great caretaker for Daniel, she wanted a chance to do it herself.

The trial court denied both section 388 petitions. The court found that neither parent had made a showing of consistent visitation, that the children had good, loving relationships with their caretakers with whom they had lived virtually their entire lives, that the caretakers were willing to become adoptive parents, and that the strength and quality of the parental relationship was far outweighed by the security and sense of belonging the children had with their caretakers. After finding by clear and convincing evidence that the children were adoptable and that it would be detrimental for the

children to be returned to mother or father, the court terminated parental rights. The court ordered the custody and control of the children transferred to the Department for adoptive planning and placement, and ordered adoption as the permanent plan.

Mother and father filed timely notices of appeal.

## DISCUSSION

### I. Denial of mother's section 388 petition

Mother contends that the juvenile court abused its discretion in denying her section 388 petition.

In the juvenile court mother bore the burden of supporting her petition with proof of changed circumstances. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415 (*Jasmon O.*); § 388.) The change in circumstances must be substantial. (*In re Heraclio A.* (1996) 42 Cal.App.4th 569, 577.) It was also mother's burden to demonstrate that regaining custody would promote David and Daniel's best interests. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) The burden is a heavy one, as mother was required to overcome the rebuttable presumption created by the termination of reunification services, that returning the children to her custody was *not* in their best interests. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 302 (*Marilyn H.*).) On appeal it is mother's burden to show a clear abuse of discretion by the juvenile court. (*Stephanie M., supra*, at p. 318.) "The denial of a section 388 motion rarely merits reversal as an abuse of discretion. [Citation.]" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686 (*Amber M.*).) The court's ruling will not be disturbed unless it "'"has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'" [Citations.]" (*Stephanie M., supra*, at p. 318.)

Mother contends that she established a substantial change of circumstances in that one month prior to the hearing she had completed a 26-week course on parenting and substance abuse with individual sessions, and that she was on the first step of a 12-step program. Mother also points to her admission that she had a "really bad drug problem," and argues that this admission was a substantial change in circumstances because it was a

9

"radical" departure from her mental state at the outset of the dependency proceedings, when she denied having a drug problem or a history of substance abuse.

Relying on authority that requires a juvenile court to liberally construe a section 388 petition, mother suggests that the court was required to believe her testimony that she had been sober for a year, and to construe that period as sufficiently sustained changed circumstances to meet her burden. (See, e.g., *Jasmon O., supra*, 8 Cal.4th at p. 415; *In re Angel B*. (2002) 97 Cal.App.4th 454, 461; Cal. Rules of Court, rule 5.570.) As these authorities make clear, however, liberal construction of the petition is a *pleading* rule, applicable to the court's decision whether to grant a hearing. As the juvenile court did in fact grant a hearing on mother's petition, the argument is not applicable here.

We reject mother's suggestion that the juvenile court was required to liberally construe the *evidence* in her favor. We review the evidence in the light most favorable to the juvenile court's orders. (See *In re Autumn H*. (1994) 27 Cal.App.4th 567, 576 (*Autumn H*.).) In determining whether a parent has met her burden, the juvenile court may consider the entire factual and procedural history of the case. (See *In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) It is the exclusive province of the juvenile court to weigh the evidence, determine the credibility of witnesses, and to resolve conflicts in the evidence; and we may not reject those determinations on appeal. (See *In re Casey D*. (1999) 70 Cal.App.4th 38, 52-53 (*Casey D*.).)

Mother's drug related arrests and convictions date from the year 2000. Her claimed date of sobriety is October 16, 2012, giving her a substance abuse history lasting 12 years. Even if we were to assume that the juvenile court believed mother's uncorroborated claim to have changed, to be sober, or to be diligently participating in a 12-step program, we would find no abuse of discretion in a finding that mother had not met her burden to show changed circumstances. After 12 years of substance abuse, one year of sobriety and working on the first step in a 12-step program are insufficient to prove substantially changed circumstances. At most they show *changing* circumstances. (Cf. *Amber M., supra*, 103 Cal.App.4th at p. 686 [372 days out of 17 years, and step three of 12-step program]; *In re Cliffton B*. (2000) 81 Cal.App.4th 415, 423-424 (*Cliffton B*.)

10

[seven months of clean tests]; *Casey D., supra*, 70 Cal.App.4th at pp. 47-48 [recently sober; 12-step program not yet begun]; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 (*Kimberly F.*) [sober 120 days].)

Mother suggests we should reject the reasoning of such cases because a recovering substance abuser is always in recovery, meaning her circumstances can always be considered as *changing*; thus, she cannot meet a legal standard of *changed* circumstances. She argues that instead, the inquiry should be how radically she has changed her own mental attitude. Mother has cited no authority setting forth a rigid legal standard for changed circumstances, and we are aware of none. Whether mother met her burden remains a discretionary exercise, and the standard of review remains whether that exercise of discretion was arbitrary, capricious, or patently absurd. (*Stephanie M., supra*, 7 Cal.4th at p. 318.)

In any event, no matter how much mother's circumstances may have changed, she was not entitled to a modified order unless she also demonstrated that the change would be in the children's best interests. (*Stephanie M., supra*, 7 Cal.4th at p. 318.) Mother claims to have met her burden of proof with evidence in each of the following categories: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F., supra*, 56 Cal.App.4th at p. 532.) [7]

With regard to the first and third factors, mother concedes that her substance abuse was a serious problem, but she argues she has maintained her sobriety and "successfully addressed the issue which led to dependency," at least to the degree that "further reunification services were warranted." Disregarding all unfavorable evidence, mother

---

[7]     Mother contends that the juvenile court's discretion was *circumscribed* by the *Kimberly F.* factors; however, the opinion makes clear that the factors are guidelines only and that the juvenile court is not limited or bound by them. (*Kimberly F., supra*, 56 Cal.App.4th at p. 532.)

11

cites only her testimony in support of her position. For example, at the disposition hearing for Daniel in January 2012, the juvenile court ordered mother to participate in, a *full* drug/alcohol program with aftercare, to investigate an inpatient drug program with the Riverside Probation Department, to enroll in a 12-step program with a court card and a sponsor, and to submit to random drug and alcohol testing. Mother submitted only a certificate of completion from Another Chance Health Services, without any information that the program complied with the court's order.[8] Mother submitted no reports regarding random testing, no court card or other evidence of when and where she attended meetings of her 12-step program, and no evidence of any attempt to investigate an inpatient drug program. As mother has not shown that she complied with any of the court's orders we cannot agree with her conclusion that she "successfully addressed the issue which led to dependency."

With regard to the strength of relative bonds, the second factor, mother argues she was sober during her monitored visits, cites the CSW's assessment that the visits were "appropriate," as well as her testimony that the boys knew she was their mother and called her "Mommy" or "Mommy Julia." Mother submitted no testimony from monitors or other witnesses to her visits, no psychological report or bonding study, and she barely described the visits herself. Moreover, in another section of her brief, mother concedes that "the record is utterly devoid of any discussion regarding the nature of the contact between the boys and their parents," and that there was "scant" evidence that she acted in a parental capacity during visits.

Mother has cited little evidence of the boys' bonds with their caretakers and she does not undertake a comparison. Instead, she simply argues that David's aggressive behavior had strained his bond with Jessica. Mother also cites her own opinion that Daniel should be in therapy because he is more active than David, but says nothing of the

---

[8]     Mother had enrolled in an aftercare program the year before, and as of February 2011 she was in compliance with the program, was receiving individual and drug counseling, and had tested negative in three random drug tests, however she submitted no evidence of completion of that program.

boys' attachments to their caretakers. On the other hand, mother concedes respondent's point that the boys have been raised from infancy by their aunts with whom they have secure relationships. Indeed, as respondent also observed, the CSW reported in September 2012 that Jessica had provided David with a loving, nurturing home. In January 2013, the CSW reported that David identified his aunt as his mother and his aunt's partner as his father. Jessica "indicated that David was essentially her son, and was treated no differently than her [two] biological children." In 2012, the CSW reported that Irene, the adoptive mother of Daniel's half-sister, was devoted full time to Daniel's care, was attentive to his needs, and very interested in adopting him. The bond between them continued to grow closer, as they did "just about everything together." In sum, mother failed to produce sufficient evidence to overcome the rebuttable presumption that granting the petition would not be in the boys' best interests. (See *Marilyn H., supra*, 5 Cal.4th at p. 302.)

Nonetheless, mother contends that providing her with further reunification services would have no "downside" because she would most likely continue to have a relationship with the boys as they would remain in the custody of relatives, and it would make her a better mother. Mother concludes that there would be "absolutely no threat to the children's security or stability." We disagree. Security and stability result from having a permanent home and a sense of belonging to a family. (See *In re Amanda D.* (1997) 55 Cal.App.4th 813, 821; *Autumn H., supra*, 27 Cal.App.4th at p. 575.) Mother's petition was filed on the eve of freeing the children for adoption. She had been given nearly two years to become a better mother to Daniel and nearly three years to become a better mother to David. "While this may not seem a long period of time to an adult, it can be a lifetime to a young child. Childhood does not wait for the parent to become adequate. [Citation.]" (*Marilyn H., supra*, 5 Cal.4th at p. 310.) We conclude that the juvenile court did not abuse its discretion in denying the petition.

## II. Termination of mother's parental rights

Mother contends that the juvenile court erred in terminating her parental rights after refusing to apply the benefit exception of section 366.26, subdivision (c)(1)(B)(i).

13

The juvenile court found that mother had not "made any kind of showing that [she had] had consistent visitation with the children such that it would cause the court to reconsider the termination of parental rights."

The juvenile court had terminated reunification services and scheduled a section 366.26 hearing as to David in October 2010, and as to Daniel in March 2013. Each order gave rise to a rebuttable presumption of mother's parental unfitness. (*Marilyn H., supra*, 5 Cal.4th at pp. 309-310.) Because mother did not challenge those orders, termination of parental rights was "relatively automatic" once the court found the children adoptable. (*In re Zacharia D*. (1993) 6 Cal.4th 435, 447.) As the juvenile court found by clear and convincing evidence that it was likely the children would be adopted, the court was required to terminate mother's parental rights, unless mother established that termination would be detrimental to the children because she had maintained regular visitation and contact with them and they would benefit from a continuing relationship. (See § 366.26, subd. (c)(1)(B)(i).) Thus it was mother's burden to establish the exception and to prove that termination of her parental rights would be detrimental to the children. (*In re Valerie A*. (2007) 152 Cal.App.4th 987, 997.) Moreover, because the children were very young and mother had not progressed beyond supervised visits, overcoming the presumption in favor of adoption required mother to show exceptional circumstances. (*Casey D., supra*, 70 Cal.App.4th at p. 51.)

Mother contends that a challenge to a juvenile court's order terminating parental rights and refusing to apply a statutory exception is reviewed for substantial evidence as stated in *Autumn H., supra*, 27 Cal.App.4th at page 576. Mother then argues that the court's ruling was error under that standard because substantial evidence supported the application of the exception. Mother has misstated the test; it is not whether substantial evidence supported application of the exception, but whether there is substantial evidence to support the finding that the exception does *not* apply. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.) "[We] affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.]" (*Ibid*.) Thus, "a [substantial-evidence] challenge to a juvenile court's finding that there is no beneficial

[parental] relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.]" (In re *Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*), quoting *In re I.W.* (2009) 180 Cal.App.4th 1517, 1529.)

The California Supreme Court has held that dependency orders are reviewed for abuse of discretion. (*Stephanie M., supra*, 7 Cal.4th at p. 318.) Some appellate courts apply a substantial evidence test and some review for abuse of discretion; still other courts have applied a kind of hybrid standard, applying both as appropriate. (See, e.g., *Bailey J., supra*, 189 Cal.App.4th at pp. 1314-1316.) Under the hybrid standard, once the parent shows that undisputed substantial evidence compelled the court to find a beneficial parental relationship, we review the juvenile court's "quintessentially discretionary determination" that termination of the relationship would not be detrimental to the children. (*Id.* at pp. 1314-1316.) The juvenile court' s order is presumed to be correct, and it is mother's burden to show error. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) As mother contends only that substantial evidence supported application of the exception, not that undisputed evidence compelled its application, she has not met her burden.

Moreover, mother has not shown that she satisfied even the "threshold prong" required for the benefit exception to apply: that she maintained regular visitation and contact with the children. (*In re Zeth S.* (2003) 31 Cal.4th 396, 412, fn. 9.) Mother has summarized several individual visits and periods of regular or semi-regular visitation, but does not dispute respondent's observation that her visits with David were inconsistent during the first few months after David's detention in December 2009. Mother acknowledges that her visits, although weekly in January and February 2010, were only "as often as could be arranged" in March 2010. Our review of the record indicates that visits were regular for another month or so, were "more or less consistent" until Daniel was born in October 2010, and then stopped, other than Christmas and another day or two, for almost two years. Mother was incarcerated in January 2012, released for a short time, reincarcerated in March, and released on October 16, 2012; but she did not see David until his birthday in December 2012, and she admitted that she "didn't really visit often." After several visits with David during January 2013, mother had approximately

15

four more visits up to mid-July 2013. Mother visited Daniel sporadically: about once per month from February 2011 until August 2011, and then not at all until October 2011. Mother claimed she did not see David while she was incarcerated because her sister would not bring him to the jail, but that she telephoned the boys. Mother did not say why she did not have visits from Daniel or how often she telephoned, and she provided no corroboration, such as the testimony of caretakers who passed the telephone to the boys.[9] In July 2013, the Department reported that during the previous four months, mother had had visits with Daniel twice per month. Mother has shown, at most, that the record contains evidence of semi-regular and semi-consistent visitation, not sufficient evidence to compel a finding in mother's favor.

Nor did mother establish the second prong of the exception. It was her burden to show that terminating her parental rights would be detrimental to the children because they would benefit from continuing their relationship with her. (See § 366.26, subd. (c)(1)(B)(i).) "Interaction between [a] natural parent and child will always confer some incidental benefit to the child." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Mother was required to show a relationship in which she occupied a "parental role" and a relationship in which her children displayed a "substantial, positive emotional attachment" to her. (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109.) Mother concedes that there was "scant" evidence that she acted in a parental capacity during visits and that "the record is utterly devoid of any discussion regarding the nature of the contact between the boys and their parents." She nevertheless argues that she met her burden with the following evidence: she acted appropriately during visits and did not appear to be under the influence; she brought milk and diapers to visits with Daniel when he was an infant; she and father took turns holding him while the other parent played with David; the boys called her Mommy Julia or Mommy; and father testified that David appeared to be happy when he and mother visited and that both boys sometimes cried

---

[9]     Both caretakers were in the courtroom during the hearing.

16

when they left.**10** Mother also notes that "the record contains absolutely no evidence whatsoever that [mother's] relationship with her children was harmful."

Relying on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), mother argues that she was not required to show that the children's "primary attachment" was to mother, but just that the children had a "substantial, positive emotional attachment" to her. (*Id.* at p. 299.) Mother failed to establish either a primary attachment or a substantial emotional attachment. It is not enough to produce evidence of an "emotional bond" accompanied by pleasant visits. (*In re Andrea R., supra*, 75 Cal.App.4th at p. 1108.) Even frequent and loving contact during monitored visits that amount to little more than play dates with a loving adult is insufficient to show the requisite beneficial parental relationship. (*Bailey J., supra*, 189 Cal.App.4th at p. 1316; see also *Cliffton B., supra*, 81 Cal.App.4th at p. 424.) And the absence of evidence that visits were detrimental does not establish that the visits were beneficial. (See *Bailey J.*, at p. 1316.)

A comparison to the facts of *S.B.* serves to highlight the deficiency in mother's evidence. In that case, the substantial, positive emotional attachment between parent and child existed prior to the onset of dependency proceedings and the attachment continued to exist until the section 366.26 hearing. (*S.B., supra*, 164 Cal.App.4th at pp. 300-301.) In addition, the parent in *S.B.* established the following: the father had been his child's primary caretaker for three years and thus had occupied a parental role in their relationship; as soon as the child was removed from his custody, the father immediately "started services, maintained his sobriety, sought medical and psychological services, and maintained consistent and regular visitation"; he complied with "'every aspect' of his case plan"; the child continued to display a strong attachment to her father and was

---

**10** Mother exaggerates father's testimony regarding visits, and concludes that the children would be "devastated" by a termination of parental rights. She claims the boys expressed joy upon seeing her, but father testified that David merely approached them and had a pretty good time, and that Daniel played and asked for his mom. Father testified that the boys cried about half the time or three-quarters of the time when they left, but gave no other explanation of the circumstances under which they cried or did not cry.

17

unhappy when visits ended; and the father consistently put his child's needs and safety before his own. (*S.B., supra*, at p. 298; see also *In re C.F.* (2011) 193 Cal.App.4th 549, 558-559.)

Here, as David was detained at birth, he had no substantial preexisting attachment with mother, and although mother was Daniel's caretaker for two months, this was insufficient to find a preexisting parental relationship. (See *Bailey J., supra*, 189 Cal.App.4th at p. 1316, fn. 3.) And unlike the father in *S.B.*, mother failed to comply with the case plan, failed to consistently and regularly visit the boys throughout the dependency period, and for nearly two years she placed her addiction before her children's needs. Undisputed evidence did not establish that mother had a beneficial parental relationship with David and Daniel.

Once a parent establishes a beneficial parental relationship, the juvenile court must balance the strength and quality of the relationship against the security and sense of belonging that the prospective adoptive parents would confer. (See *Cliffton B., supra*, 81 Cal.App.4th at pp. 423-424; *Autumn H., supra*, 27 Cal.App.4th at p. 575; § 366.26, subd. (c)(1)(B)(i).) The court's determination is reviewed for abuse of discretion. (*Bailey J., supra*, 189 Cal.App.4th at pp. 1315-1316.) Despite mother's failure to establish a beneficial parental relationship, the juvenile court did engage in such balancing, and found that providing the children with security and a sense of belonging that the adoptive parents would provide, far outweighed the strength and quality of the natural parents' relationship with the children. The court also found that the children had good, loving relationships with the caretakers they had been with virtually their entire lives and who were willing and desired to become adoptive parents. As mother does not dispute this latter finding and did not establish a beneficial parental relationship, we find no abuse of discretion.

## DISPOSITION

The juvenile court's order is affirmed as to mother, and father's appeal is dismissed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST